## MARTÍNEZ v. PAGÁN, LÓPEZ & CO.

### APPEAL from the District Court of Mayagüez.

No. 615.—Decided April 27, 1911.

CONTRACT—COMMERCIAL PURCHASE AND SALE—CONSUMMATION OF THE CONTRACT.—It appearing from the evidence taken in this case that the plaintiff delivered to the defendants the invoice of 191 bags of sugar he had sold them, specifying the number, weight, grade, price, and total amount due; that the defendants received them without any objection whatever; that the storekeeper was notified that the sugar remained for account of the defendants, to whom it had been sold, and that the latter had disposed of part thereof, the merchandise must be considered as having been delivered and the commercial contract of purchase and sale as having been consummated; and the loss of the sugar, occurring after the consummation of the contract, must be borne by the defendants, article 333 of the Code of Commerce being applicable hereto.

ID.—Article 334 of the Code of Commerce is not applicable to this case, because the sugar having been weighed by the storekeeper upon his receiving the same, the entire quantity on deposit was placed at the disposal of the defendants, with delivery of the invoice specifying the weight of the bags and the number of quintals of each grade, as also the price of each and total amount due by the purchaser, and the plaintiff, according to the terms of the contract, had nothing further to do for said contract to be considered as having been perfected, the merchandise from that moment remaining on deposit for account and risk of the purchasers.

The facts are stated in the opinion.

*Messrs. Fernando Vázquez, N. B. K. Pettingill,* and *Henry F. Hord* for appelants.

*Mr. Pascasio Fajardo* for respondent.

MR. JUSTICE MACLEARY delivered the opinion of the court.

This suit was brought by Martínez against Pagán, López & Co. to recover a balance of nine hundred and fifty dollars

($950), alleged to be due on an account for sugar sold and delivered by plaintiff to defendants. The defendants deny that any sum whatever is owing by them to the plaintiff.

On August 15, 1910, the trial court rendered judgment for the defendants in the following terms:

"This cause was called for hearing on August 11, 1910, the plaintiff appearing by his counsel, the attorneys, Pettingill, Cornwell and Vázquez, and the defendant partnership by its counsel, the attorney, Pascasio Fajardo. After having heard the pleadings, the evidence, and the arguments of counsel, the court reserved its decision.

"It appears from the evidence heard in this case that Angel Martínez executed a contract on May 31, 1910, with Pagán, López & Co., by which plaintiff sold to the defendant partnership 191 sacks of sugar of second and third grades, at $3.70 per hundred weight the second grade, and at $3.10 per hundred weight the third grade, said sugar being deposited with the Mayagüez Sugar Company for account of Rafael Blanch. Of this sugar the defendant partnership withdrew 76 sacks, until the night of June 9, 1910, when a fire broke out in the warehouse of the Mayagüez Sugar Company, said sugar having been totally destroyed. It does not appear that said sugar had been weighed after the same was sold to the defendant. The plaintiff alleges that the defendant, Pagán, López & Co., must bear the loss of said merchandise and the latter maintains the contrary, alleging that the sugar had not been either weighed or received. It is evident that between both parties to this action there exists a perfected contract, since both parties agreed as to the thing, the object of the contract, and as to the price thereof, although the merchandise had not been delivered; but we are of the opinion that article 334 of the Code of Commerce applies in this case, which prescribes that the damages and impairment suffered by merchandise, even though it be by reason of an incidental cause, shall be for the account of the vendor if the sale took place by number, weight, or measure. In conformity with the letter and spirit of this article, we are of opinion that the risk of the merchandise sold must not be incurred by the buyer until the same has been weighed, counted, or measured. It is not necessary that either the thing or the price shall have been delivered for the contract of purchase and sale to be complete. From the moment it is agreed upon and without any further requirement the contract is complete and the obligations of the parties arise; but the transfer of the property does not exist, in our opinion, until

the thing has been weighed, counted, or measured, in those cases where article 334 of the Code of Commerce applies.

"In short, we think that there was between the parties a contract of purchase and sale complete but not consummated.

"For the reasons set forth to-day, August 15, 1910, the court decides that the law and the facts are in favor of the defendant, and dismisses the complaint without costs.

From this judgment the plaintiff promptly prosecuted an appeal and in his brief assigns one error, which reads literally as follows:

"The court erred in considering that between Angel Martínez and Pagán, López & Co. there did not exist a perfect contract of purchase and sale of 191 sacks of sugar at a stipulated price of $3.70 for one kind and $3.10 for the other per hundred weight, with the weight stated in the invoice."

From the view taken by the trial court and the error assigned by the appellant and presented for decision here the question turns mainly on the facts and the proper interpretation given to the evidence adduced on the trial. Then we must.examine the facts of the case.

The undisputed facts are that Angel Martínez, the plaintiff, had, on May 30, 1910, in the warehouse of the Mayagüez Sugar Company, in the town of Mayagüez, (191) one hundred and ninety-one sacks of sugar of two different grades—the second and third. There were (161) one hundred and sixty-one sacks of the second grade, valued at $3.70 per quintal, and (30) thirty sacks of the third grade, valued at $3.10 per quintal. The sacks each weighed about (200) two hundred pounds, more or less.

There is no question that on May 31, 1910, a contract was made between the parties hereto by which plaintiff sold to defendants (191) one hundred and ninety-one sacks of sugar of the second and third grades at $3.70 and $3.10 per hundred weight, respectively, which sugar was at that time housed in the warehouse of the Mayagüez Sugar Company. Of this sugar the defendants took out (76) seventy-six sacks

within 10 days; and on the night of June 9, 1910, a fire oc-
curred in the said warehouse whereby the balance of the
sugar was totally destroyed.

It is in regard to this loss by fire that this controversy
arose. Each party contends that the other should bear the
loss. Then the matter simmers down to the question of
whether or not the sugar had been delivered and the transfer
of the property completed.

The defendants claim that although the contract was per-
fected that it was not consummated, and that the goods were
to be delivered from time to time as they might be sold, and
that the sugar was to be weighed as it should be delivered
and paid for at intervals of 10 days, according to the amount
thus received and sold by them.

The plaintiff maintains that the sale of the sugar was
made as it lay in the warehouse, and that it had already
been weighed by the warehouseman and an invoice had been
delivered by plaintiff to defendants giving the number of
sacks and the weight of each with the grade, price, and other
particulars; that said invoice had been accepted by defend-
ants without protest or objection, and showed the given sum
due to be $1,712.13. The trial court took the view contended
for by the defendants and rendered judgment accordingly.

On behalf of the plaintiff the witness, Angel Martínez,
the plaintiff, testified as follows:

"That he presented to the partner of the firm, Mr. Peregrino
López, two samples of sugar, one of 161 sacks of second grade and
another of 30 sacks of third grade; he took them over to his office;
he presented them to him there, and he told him the price of both of
them; and Mr. López accepted the price and the quantity of sacks of
the two grades, the price of one grade being $3.71, and that of the
other $3.10; that he offered said sugar for sale and they bought it
from him, and Mr. López made a note on the same samples of the
number of sacks there was of each grade; that the sale was concluded
at that same moment; that he only informed them of the place where
the sugar was, and it not being a warehouse of his own he told them
that he would immediately give notice there that the sugar should be

placed at their disposal, so that they might dispose of it, and he would charge the same to their account; that the sugar was in the warehouse of the Mayagüez Sugar Company, from whom he had bought the same; that he bought the sugar from Rafael Blanch, and the latter had bought it from the Mayagüez Sugar Company; that he then informed Mr. López that the sugar was there deposited in the warehouse, and that he would advise Mr. Monefeld, so that the latter would deliver the same to him; that Mr. López, as representative of the firm, Pagán, López & Co., accepted the sugar where it was; that the sugar remained there for account of said firm, and on the next day, as this transaction took place on the 30th, in the afternoon the witness sent him the invoice, and he understands that Mr. López disposed of some of the sugar; that he does not know whether of a large or a small quantity, up to the time that he sent him the invoice—that is to say, until the 31st of May; that on the day when the contract or deal was made the sugar remained for account of Messrs. Pagán, López & Co.; that he told them that the sugar was there at their disposal; that they accepted what the witness told them; that he told them that it was in the warehouse of the Mayagüez Sugar Company.

"That he delivered to them the invoice on the day following the one on which the sugar appears charged in the book; that he did not personally deliver the sugar, but that it was delivered by one Hiram Arroyo, who was his employe; that in said invoice is stated the weight of the sugar, the number of hundred weights of the same, the price, and the total amount of the invoice.

"That he made an entry in his books of said transaction; that he made the same in the two books he has; that he has in his hands the blotter or waste book of his firm; that the entry relating to said sugar transaction with Pagán, López & Co. was made on May 31; that among other entries made on the same date there appear 30 sacks of sugar of the third grade, Mayagüez Sugar Company, 7,495 pounds at $3.10—$232.35, and 161 sacks second-grade sugar containing 39,994 pounds at $3.70—$1,479.78, making a total of $1,712.13; that said amount appears charged to Pagán, López & Co.

"That besides said blotter or waste book he keeps a book of accounts current; that on May 31 he entered said transaction in his book of accounts current; that he charged the amount of $1,712 to the debit of the account of Pagán, López & Co. for sugar sold to them; that there are 161 sacks of second-grade sugar and 30 of the third grade; and there appear other transactions that were made during the same day.

"That he purchased 12 sacks of sugar from Pagán, López & Co. after the sale he had made to them, and that he purchased them at $3.77½; that they sent him an invoice of said sugar, which is the same sort that the witness sold to them; that they sold it to him, at $3.77½, and that he had sold the same to them at $3.70, and that he has credited it to their account.

"That the sugar, before it was taken to the warehouse of the Mayagüez Sugar Company, had been weighed; that he knew perfectly well the weight of the sugar, and that the employe of the Mayagüez Sugar Company, Mr. Gerardo Monefeld, had weighed it; that he had sent them the invoice, in accordance with the weight of the sugar, and that they had made no objection, nor had they made any objection to it that the sugar was to remain there for their account. While the sale took place the witness told them that the sugar was there; that he had notified Mr. Gerardo Monefeld in order that the latter might place it at their disposal; that he advised Mr. Gerardo Monefeld in order to let him know that the sugar was at the disposal of Pagán, López & Co.; that Mr. Gerardo Monefeld is the manager of the Mayagüez Sugar Company, or of Mr. Oscar Bravo, and that he is in charge of the warehouse.

"That he has stated that said sugar was weighed and delivered in the warehouse of the Mayagüez Sugar Company, and that it was weighed by Mr. Gerardo Monefeld; that he does not know whether Messrs. Pagán, López & Co., or someone else of the firm of Pagán, López & Co., witnessed the weighing of the sugar; that he knows that the same was weighed, because Mr. Monefeld sent the invoice to the house of the witness, and for the same quantity that he charged to the witness; the latter sent an invoice to Pagán, López & Co.; that he does not know whether Pagán, López & Co. have witnessed the weighing of said sugar; that he did not weigh it in their presence; and that he ordered Mr. Gerardo Monefeld to deliver the same to them.

"That he remembers that before the fire Mr. Gerardo Monefeld sent word asking whether he could deliver sugar to Pagán, López & Co. of the sugar he had there, and the witness replied that he could deliver it all, because it had been sold; that he does not know whether there was no more sugar in the warehouse than the parcels referred to.

"That after May 31 the witness needed 12 sacks of one of the grades and bought them from Mr. López, and he asked him at what price he had sold it, in order to divide the difference in the

profit; he told him that he had sold it at $3.85, and he said: "Then you make 7½ cents and I the same'; and the witness accepted."

The man in charge of the warehouse, Gerardo Monefeld, testified in behalf of the plaintiff, as follows:

"That he knows Angel Martínez, and he knows for certain that the Mayagüez Sugar Company sold to Blanch and to Martínez or to one of the two, 200 sacks of second-grade sugar and 300 sacks of third-grade sugar about the month of April; and either of them indiscriminately disposed, through his clerk, of a portion of said sugar up to the time when Pagán, López & Co. sent for the sugar; and then the witness sent a person to inquire of the aforesaid two purchasers of the sugar whether it was proper to deliver the same, as he had no written order from either of them; and they answered that they had sold the rest to said Messrs. Pagán, López & Co., and after that the latter continued taking away several lots.

"That the warehouse was burnt with everything it contained on June 10; that 15 or 20 days—he is not able to state the exact time—before the date of the fire Angel Martínez had told him that the sugar was for account of Pagán, López & Co.; that Angel Martínez had not stated to him anything; that he sent word to those gentlemen informing them that Pagán, López & Co. disposed of the sugar, which, in my opinion, was their property, and they sent him word by the same clerk that the sugar had been sold to the latter; and that it came into his mind to send them said message, because the said clerk came with an order from Pagán, López & Co. for the delivery to Martínez, and for account of Martínez, of 12 sacks, of those 12 sacks which the witness up to that time had possessed as his own property. Martínez brought an order from Pagán, López & Co. for the delivery of said sugar; consequently, this made him understand that the sugar which previously had belonged to Martínez & Blanch had been sold to Pagán, López & Co., and then they replied that in fact the rest of the sugar had been sold; and afterwards Pagán, López & Co. continued disposing of the sugar in their favor; that he is unable to tell how many times Pagán, López & Co. disposed of sugar, but several times of five and six sacks of sugar; that the sugar that Pagán, López & Co. had there weighed about 250 pounds per sack—a little less. The sugar was weighed every time that a small lot was delivered; that he does not know how much all the sugar weighed that Pagán, López & Co. had and which had been sold to them by Angel Martínez; that he had made a note of all the sacks that belonged to Pagán, López & Co., and that he had

notes of all that, but they were burned; that said sugar had been weighed by order of the witness; that all the sugar had been weighed; that the weight appeared in the memorandum book kept by the witness, in the same memorandum book in which was entered all the sugar of the crop of the Mayagüez Sugar Company; that Angel Martínez had not come to ask for any sugar, but his clerk, who brought him an order from Pagán, López & Co.

"That the sugar was delivered at the request of Pagán, López & Co. through their clerk; that the authority of Pagán, López & Co. to demand the delivery of said sugar came from their office; that the knowledge of the witness that they were the owners was obtained by him from the purchaser of the Mayagüez Sugar Company, Mr. Blanch, to whom he had sent for such information in order that he might communicate to him whether the sugar was his, and continued to be his, or whether he had sold it partly or entirely to Messrs. Pagán, López & Co.; and they answered him that they had sold the rest to Pagán, López & Co.; that it was the clerk who answered; that when Pagán, López & Co. ordered any lots of sugar—a few sacks— they never sent any order, as far as the witness is able to remember."

Rafael Blanch, a relative and formerly a partner of the plaintiff, as a witness on his behalf, testified as follows:

"That they bought some sugar from the Mayagüez Sugar Company, and after having sold part of it, the witness sold the rest to Angel Martínez; that they bought from the Mayagüez Sugar Company about 250 sacks, more or less; and that the rest, which he sold to Angel Martínez, consisted of about 200 sacks; and that the aforesaid sugar was in the warehouses of Schroder & Co.; that he sold the rest to Martínez, on May 30, and that the latter sold it to Pagán, López & Co.; that said sugar remained on deposit in the warehouse of Schroder & Co., and that the same is for account of Pagán. López & Co.

"That he knows of his own knowledge that said sugar was sold to Pagán, López & Co., because he saw that at that time Martínez sent them the bill for all of his sugar, which was the rest of the sugar still on deposit in the house of Schroder & Co.

"That he saw the bill when it was sent by Martínez, and that he saw the weight stated in the bill but that he could not state the same exactly; that it contained the weight and also the number of sacks; that he cannot state the same exactly, but that it contained sacks, weight, and quality, for there were two qualities; that he frequently

sees Pagán, López & Co., and that they spoke about business in general; that with reference to said transaction they told the witness that they thought they would not have to pay for the sugar, because they could not pay for more than the sugar they had disposed of; that that was after the disaster—after the fire—that he spoke with Peregrino López.''

Hiram Arroyo, an employe of Martínez, testified in behalf of the plaintiff, as follows:

''That he was there on May 31 of this year; that on said day he took an invoice of several sacks of sugar to Pagán, López & Co., pursuant to an order from Martínez, which sugar had been sold to Pagán, López & Co., and that he himself had made up the invoice; that the sugar had been sold to Pagán, López & Co.; that the invoice contained the weight, the price, and the number of sacks; that he delivered said invoice to Mr. Peregrino López; that said gentleman is present, and that he said to him it was all right.''

Peregrino López, one of the defendants, being called by the plaintiff as a witness, testified as follows:

''That he knows that said firm has sold sugar to Mr. Angel Martínez; that said sugar consisted of several lots; that in the month of July of this year there was a lot of 12 sacks of sugar which the firm had not sold to Angel Martínez; that he had been the vendor of a lot of sugar; that he sold 12 sacks, and after they had been sold he asked for them at their house, of the same sugar that he had sold to them; that he made out an invoice of said sugar; that that is the invoice.

''That Pagán, López & Co. had purchased from Mr. Angel Martínez a quantity of sugar, which was warehoused in the depositories of the Mayagüez Sugar Company. According to the agreement made Pagán, López & Co. could dispose of partial quantities.

''That on the fourth or third day Mr. Martínez came to the office of the witness to inform him that he had sold 12 sacks of sugar to Mr. Montalvo of San Germán, with an increase in the price of 15 cents over and above the price at which he had sold the sugar to Pagán, López & Co. When he heard that the witness objected, because he did not think it was proper that the sugar that had been sold to Pagán, López & Co. should be available for the purpose of selling the same elsewhere; then Mr. Martínez proposed to the witness to divide the total amount of the difference, to which the witness made no ob-

jection, and he then ordered that the 12 sacks of sugar be charged to the account of Mr. Martínez at the price agreed upon with Pagán López & Co."

The defendants in their turn introduced the following evidence. Peregrino López, the managing partner of the defendants, testified, in their behalf as follows:

"That he has had many kinds of mercantile transactions with Mr. Angel Martínez at the end of the month of May of the current year; that the circumstances of the transaction are as follows: That Mr. Martínez, on May 30, presented himself in the office of the witness with two samples of sugar, offering him 171 sacks of second-grade sugar and 30 sacks of third-grade sugar at the price of $3.70 for one kind and $3.10 for the other. As the witness was on friendly terms with Mr. Martínez he naturally told him that such a heavy transaction was not convenient for him, and Mr. Martínez consented to it that said sugar should be taken in partial quantities, at the convenience of Pagán, López & Co., and that every 10 days the quantity taken should be paid for. For this purpose he ordered that the liquidations or documents showing the weight, which were issued by the Mayagüez Sugar Company, were carefully filed in order to be used for the purposes of the liquidation. Afterwards, on the 9th or the 10th, at daybreak, a disaster took place in said building; they had taken 70 sacks; that the witness has a statement of the sugar taken and which was seen by Mr. Martínez, and he said to the witness that the sugar was for account and risk of the witness, and he proposed to him various settlements; and he only told him that he would submit the matter to a court of justice which would decide the same in favor of the party who was right; that Mr. Martínez had drawn on him for the amount of the sugar of which he had disposed; that he paid said sugar to him; that he had drawn for other amounts, which the witness did not think he owed, and he rejected the drafts; that no person, by order of the witness as manager of the firm of Pagán, López & Co., went to the place where the sugar was in order to receive said sugar; that he has disposed of partial quantities of said sugar from the date they made the transaction until the disaster took place; that those partial quantities were delivered for account of the witness, and it was the Mayagüez Sugar Company that weighed the sugar on delivering the same; that he has seen some private documents that have been recognized by Mr.

Gerardo Monefeld, and that said documents are in the possession of Pagán López & Co.

"That the witness, on paying the said draft of $500 which had been drawn on him by Mr. Angel Martínez in order to be collected by the Colonial Bank, he remained indebted to Mr. Martínez for $27 and some cents; and that said sum has been placed in the hands of the notary, Rodolfo Ramírez Vigo, on account of the protest of a draft of $50 for nonpayment.

"And the witness goes on answering the defendant: That as a merchant he has books; that he has stated that he had bought some sugar from Mr. Angel Martínez; that Angel Martínez informed him that said sugar was stored in the warehouse of the Mayagüez Sugar Company; that he has already stated the price; that it was the duty of the witness, by reason of the purchase of said sugar, to liquidate every 10 days the quantity he had taken from the warehouse where it was; that when he made the transaction with Mr. Martínez concerning the 200 and odd sacks neither the witness nor anyone else sent by him weighed the sugar; that the sugar was weighed in separate portions, according to the quantity taken; that the day on which the fire occurred he had taken 70 sacks of second-grade sugar and six of third-grade sugar, making a total of 76 sacks; that on the 10th, after the fire, Mr. Martínez disposed of a small sum amounting to 40 and odd dollars, until the 11th, when a sight draft was presented to him for the amount of $500, which he paid: that on that same day he made a liquidation of the account, and according to said liquidation there remained $27 after the draft had been paid.

"That on the 11th he made a liquidation of the sugar he had taken; that he made said liquidation in accordance with the vouchers he had; that he liquidated the account of the sugar that had been taken without the intervention of Martínez, in order to credit the amount of the same in the account of Mr. Martínez, and, also, to find out the value of the lots that he had taken away; that he does not know whether the plaintiff, Mr. Martínez, has accepted or received the amount of over $27 that the witness deposited in the hands of the notary; that in the contract made between Martínez and the witness there was no stipulation whatever to sell the sugar within a limited time."

From these facts we must conclude that a delivery had been made of the sugar sold. The invoice was promptly sent to the purchaser giving the full particulars of the sale, the

number of sacks, the weight, the grade, the price, and the
amount due in gross. This was received without any objec-
tion whatever. A few days thereafter the plaintiff, needing
12 sacks of sugar of the kind sold, repurchased them from
the defendants at an advanced rate and they were redelivered
on defendant's order to the warehouseman. The transfer
was duly made of the (191) one hundred and ninety-one sacks,
in the first place, by an order from the plaintiff to the ware-
houseman to hold all the sugar at the disposal of the defend-
ants, notifying him that it had been sold to them. The defend-
ants acknowledge having withdrawn and sold (76) seventy-
six sacks of the sugar, for which they willingly paid ($762.13)
seven hundred and sixty-two dollars and thirteen cents. The
trial court makes the case turn on the fact, as found, that
"It does not appear that said sugar had been weighed after
the same was sold to the defendant." This was not under
the circumstances of this case a vital matter. The sugar had
already been weighed by the warehouseman at the time it
was received for storage and an invoice was furnished by
the seller to the purchaser giving not only the weight of the
sugar in detail, showing the number of quintals of each grade,
but also the price of the same and the gross sum due from
the vendee to the vendor. However, no weighing was neces-
sary under the terms of the sale. Nothing more remained
for the plaintiff to do in the premises. He did not have to
transfer the sugar from the warehouse to the store of the
defendant. It was incumbent on the purchaser to transport
the goods from the warehouse whenever he chose to place
them in his own store or to deliver them to a purchaser.
This he did in the case of 76 sacks of sugar, for which he
paid without objection. The sugar remained in the ware-
house at the time of the fire subject to the orders of the
defendant and at his risk, under article 333 of the Code of
Commerce. After the sale and the delivery of the invoice,
there being nothing more for the plaintiff to do to make the
sale complete, it was consummated according to the univer-

sal custom of merchants in such cases; and had there been
no fire there would never have been any controversy in regard
to the matter.    There is no question that this was a com-
mercial transaction as defined in article 325 of the Code of
Commerce, and that this case is to be governed by the said
code.    Articles 333 and 334 of the Commercial Code read
as follows:

"Article 333.—The damages and impairment suffered by mer-
chandise after the contract has been consummated and the vendor
has the goods at the disposal of the purchaser in the place and at
the time agreed upon, shall be suffered by the purchaser, except in
cases of carelessness or negligence on the part of the vendor.

"Article 334.—The damages and impairment suffered by merchan-
dise, even though it be by reason of an accidental case, shall be for
the account of the vendor in the following cases:

"1. If the sale took place by number, weight, or measure, or if
the article sold is not fixed and determined, with marks and signs
which identify it.

"2. If by reason of an express agreement or the usages of com-
merce, in view of the nature of the article sold, the purchaser has
the privilege to previously examine and investigate it.

"3. If the contract contains a clause to the effect that the delivery
is not to be made until the article sold has acquired the conditions
stipulated."

The sole matter involved in the decision of this case is
which of the two articles quoted should be applied to facts
proven on the trial.    The second and third paragraphs of
article 334 plainly have no reference to the facts found in
the record.    The first paragraph of the said article was
applied by the trial court to the case before it because the
goods had not been weighed after the sale.    By the terms
of the law itself this is only necessary where the sale is made
by weight, number, or measure; as, for instance, where the
purchaser contracts for 1,000 pounds of corn to be taken
from a stock containing many thousand pounds or from a
cargo just arrived and not yet known to contain a given
amount of goods.    But in the case before us the entire stock

belonging to the plaintiff and remaining in the warehouse, which belonged to a third party, was the object of the sale. Nothing in the nature of weighing or counting or measuring remained to be done to consummate the contract of sale. No weighing was necessary because the stock had been sold as an entirety or in bulk and was already completely segregated. The principles of the Code of Commerce, as set forth in article 334, are substantially the same as prevailed at common law. In the case of *Acraman* v. *Morrice* (8 C. B., 449), the English court, in the language of Judge Wilde, says: "Upon a contract for the sale of goods, so long as anything remains to be done to them by the seller, the property does not pass, and the seller has a right to retain them." (Shirley's Leading Cases, p. 202.) The converse of this is also true, as appears from the case of *Tarling* v. *Baxter*, on the previous page of the same volume, where it is written: "The rule of law," said Bayley, J., "is that where there is an immediate sale nothing remains to be done by the vendor as between him and the vendee, the property in the thing sold vests in the vendee, and then all the consequences resulting from the vesting of the property follow, one of which is that if it be destroyed the loss falls on the vendee." Of course, if it had turned out that there had been a mistake in the weights as furnished by the warehouseman, a correction of the amount of the purchase money would have had to be made in accordance with article 336 of the code. But in the case now under consideration the loss was suffered after the contract had been consummated and the goods were at the disposal of the purchaser and the damages must be suffered by the purchaser under the terms of the Commercial Code.

The transaction properly falls under the purview of article 333 of the Code of Commerce and not under article 334 of the said code, where it is placed by the trial court.

Then as the court below erred in the application of the law to the facts of this case, as well as in his estimate of the facts as shown on the trial, the judgment rendered should

be reversed and a proper judgment here rendered in favor of the plaintiff for the amount claimed.

*Reversed.*

Mr. Chief Justice Hernández and Justices Wolf, del Toro, and Aldrey concurred.